UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DYSON, INC.                                    CIVIL ACTION

VERSUS                                         NO: 07-9633

ORECK CORPORATION, *ET AL.*                    SECTION: R(4)


### ORDER

Before the Court is Dyson, Inc.'s Motion for Summary Judgment.  Dyson's motion is granted in part and denied in part for the following reasons.

**I.    Background**

**A.    Procedural Background**

This case is the third action in the past four years between Oreck and Dyson.  In the first action, *Oreck Holdings, LLC v. Dyson, Inc.*, No. 05-361, Oreck alleged that Dyson's "no loss of suction" advertisement was false advertising under the Lanham Act.  Dyson brought a number of false advertising counterclaims against Oreck, (05-361, R. Doc. 15), and the parties filed cross-motions for summary judgment.  Before the motions were heard, the

parties settled, and the Court dismissed the action with prejudice on January 10, 2007. (05-361, R. Doc. 148).

Pertinent to this motion, the parties entered into a settlement agreement containing the following provision governing future advertising:

1. *Future Advertising*

a. The parties shall be free to use, at their election, the advertising claims that are being made by either party as of the Effective Date for the products existing in the United States marketplace as of the Effective Date, without incurring any further liability to each other. This provision shall also apply to, and allow such advertising by, (i) distributors, (ii) retailers and (iii) affiliates.

b. For a period of one year after the Effective Date, neither Dyson nor Oreck, in any visual element of its advertisements, shall use or feature the vacuums of the other in connection with any claim that either product is unsanitary, dirty, unhealthy, or the like.

(Dyson's Ex. 1.) Four months after the settlement, Oreck sued Dyson for false advertising with regard to its newest model, the

DC18. (07-2744, Complaint, R. Doc. 1). Oreck again claimed that Dyson's "no loss of suction" claim was false advertising, and the Court issued summary judgment on *res judicata* grounds. (07-2744, R. Doc. 42).

Dyson filed the present suit against Oreck Corporation; Oreck Direct, LLC; Oreck Merchandising, LLC; Oreck Sales, LLC; Oreck HomeCare LLC; and Oreck@Home, LLC (collectively known as "Oreck") on December 18, 2007. Dyson claims that Oreck's new advertising campaign directly attacking Dyson violates the Lanham Act, the Louisiana Unfair Trade Practices Act and the terms of the settlement agreement. Dyson now moves for summary judgment that certain infomercials, in-store displays, demonstrations, and newspaper advertisements violate the settlement agreement's prohibition against the "use or feature" of a Dyson vacuum "in any visual element of [Oreck's] advertisements . . . in connection with any claim that [the Dyson] is unsanitary, dirty, unhealthy, or the like."

## B.    The XL 21 Infomercials

Dyson first argues that two infomercials promoting the Oreck XL 21 violate the terms of the settlement. The Court briefly describes the alleged violations here. About two-minutes in to Oreck's 28 minute "long-form" infomercial, Oreck displays a Dyson next to two other bagless vacuums. (Dyson's Ex. 10, UPR1-Clip

1.)  A voice-over states that "when it comes to vacuums, bagless is a dirty word.  Bagless vacuums . . . can spew dust and germs into the air you breathe."  As the announcer makes this statement, a large red letter X flashes over the line-up of vacuums.  (*Id.*)  The voice-over then announces that "A leading consumer magazine warns to wear a dust mask when emptying a bagless vacuum."  (*Id.*)  This statement is accompanied by a graphic that displays the magazine's warning in the style of a newspaper or magazine headline.  (*Id.*)  The infomercial does not identify the Dyson by name, but Oreck's Director of Marketing testified in her deposition that one of the bagless vacuums portrayed is a Dyson.  (Dyson's Ex. 9, 78:16-19.)

A 120-second version of the advertisement shows the same line-up of bagless vacuums and states that "Many vacuums can spew dust and germs into the air you breathe."  (Dyson's Ex. 10, XUPR-XL21.)

**C.  Oreck's "Dare to Compare" Campaign**

Dyson also argues that Oreck breached the settlement agreement with its "Dare to Compare" advertising campaign, launched in the Fall of 2007.  As the name suggests, the campaign invites customers to compare the Oreck vacuum with its bagless competitors, including the Dyson.  This campaign involved several elements, including an infomerical, in-store demonstrations and

display materials, and newspaper advertisements.  Dyson argues

that each aspect of the campaign breached the parties' agreement.

    *i.*    *"Dare to Compare Infomercial"*

Oreck produced a 28 minute infomerical in connection with

the "Dare to Compare" campaign.  (Dyson's Ex. 10, Vac-1 Dare to

Compare.)  Dyson's motion describes several alleged breaches of

the settlement agreement, which are briefly summarized here:

1.  The infomercial's host, Terrie Ouelette, empties a Dyson DC

14 and exclaims: "Look at that, I'm dirty.  And not only that, my

countertops are dusty, the floor I just vacuumed is dirty again,

and now I have to touch it to close it . . . I don't think this

is sanitary at all.  Oh, and look at it, I'm a mess."

2.  Ouelette and co-host David Oreck have the following exchange:

<u>Ouelette</u>: "I can really see how a bagless vacuum cleaners will

spread dirt and dust all over my house and me."

<u>David</u>: "That's because simply by emptying this bagless dirt cup

you not only can be spreading dust and nasty particles into the

air, you can also get that mess all over you . . . .  Not very

clean or sanitary.  And their dirty little secret is out."

3.  The infomerical's announcer makes the following statements:

a.  "Are you . . . disgusted with the unsanitary mess that comes

with emptying the dust cup of bagless vacuums?";

b.  The Oreck XL Ultra is "more sanitary" and the "cleaner . . .

5

way to vacuum your home."

4.  The infomercial depicts consumers holding a Dyson dustbin over a trashcan and saying, "what a mess; I don't like dealing with that dust; dust city; that's gross."

   *ii.  The "Dare to Compare Toolkit"*

As part of the campaign, Oreck provided its franchisees with an advertising "toolkit."  (Dyson's Ex. 17 at Oreck 06571.)  The toolkit provides sample radio and newspaper advertisements inviting consumers to compare the Oreck and Dyson.  One newspaper ad shows the Oreck XL Ultra and the Dyson DC 14 next to each other with the caption:

> Dyson and Oreck are now going head to head only at your
> Oreck Clean Home Center.  No Guess work involved.  You
> can see who beats who in advanced technology.  Which is
> heavy.  And which is light . . . .  Which one is more
> sanitary.  And which one is so advanced it helps inhibit
> bacteria in and on the vacuum.

(*Id.* at 06592.)

The toolkit also contains instructions for in-store demonstrations.  The instructions invite franchisees to buy a Dyson DC14 at Oreck's expense and display it alongside Oreck upright vacuums in their stores.  (*Id.* at Oreck 06572.)  When a customer enters a franchisee's store, the toolkit instructs the

franchisee to "invite them to compare the Dyson to the Oreck XL
Ultra. Ask them to compare the two vacuums for . . .
cleanliness." (*Id.*)

To help franchisees "present and execute the Dyson Challenge
consistently and effectively," Oreck provided franchisees with an
eight-point script and training guide. (Dyson's Ex. 18 at Oreck
08761-64.) The materials state that they "should be used as a
training guide for your associates to go through the script and
get comfortable with presenting the 8-steps of the Dyson
challenge." (Id. at 08761). In connection with the heading "Step
4: Compare Dirt Disposal," the script states: "Using a dust cup
never made much sense to me. Every time you empty it you can
spew the dust back into the room you just cleaned. Its pretty
disgusting! Plus that dust cup can really get nasty smelling
after a month or two." (*Id.* at 08763.)

The toolkit further directs franchisees to display certain
informational sheets "in an 8.5 x 11 plexi sign near your store's
demo area." (*Id.* at 08761.) One of the informational sheets
depicts a Dyson DC14 with the caption "Dirty/Difficult to Empty."
(*Id.* at 08767.)

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when there are no genuine

issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

**B.    Contract Interpretation**

In *Dore Energy Corp. v. Prospective Inv. & Trading Co., Ltd.*, the Fifth Circuit recently stated the principles governing settlement agreement interpretation under Louisiana law.

A settlement agreement is a contract. The rules of construction applicable to contracts are therefore used. *Trahan v. Coca Cola Bottling Co. United, Inc.*, 894 So.2d 1096, 1106 (La. 2005); *see also La. Civ. Code Ann. art.* 3071. The ambiguity of a contract is a legal question. *Sims v. Mulhearn Funeral Home, Inc.*, 956 So.2d 583, 590 (La. 2007). If the answer to the legal question of ambiguity is in the negative, then interpreting that unambiguous contract is also a legal issue for the court. *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998).

Louisiana had adopted several statutory rules for interpretation of contracts. We find some relevant guidance in each of the following sections of the Louisiana Civil Code:

Art. 2045. Determination of the intent of the parties: Interpretation of a contract is the determination of the common intent of the parties.

Art. 2047. Meaning of words: The words of a contract must

be given their generally prevailing meaning. Words of art
and technical terms must be given their technical meaning
when the contract involves a technical matter.

Art. 2048. Words susceptible of different meanings: Words
susceptible of different meanings must be interpreted as
having the meaning that best conforms to the object of
the contract.

Art.2049. Provision susceptible of different meanings: A
provision susceptible of different meanings must be
interpreted with a meaning that renders it effective and
not with one that renders it ineffective.

Art. 2050. Provisions interpreted in light of each other:
Each provision in a contract must be interpreted in light
of the other provisions so that each is given the meaning
suggested by the contract as a whole.

570 F.3d 219, 225 (5th Cir. 2009).

## III. Analysis

Oreck advances a barrage of arguments that the phrases "use
or feature," "in connection with" and "unsanitary, dirty,
unhealthy, or like" in the settlement agreement are ambiguous as
applied to the advertisements.  The Court addresses two of
Oreck's more general arguments before analyzing each ad.

First, the Court rejects Oreck's argument that the phrase

"in connection with" is ambiguous.  Oreck attempts to create ambiguity by focusing on the definition of "connection," which it defines as "a causal or logical relation or sequence; contextual relation or association; or relationship in fact."  (Oreck's Mem. in Opp. at 8)(*citing* Merriam-Webster's Dictionary).  Relying on this definition, Oreck argues that "[o]ne interpretation of the phase would mean that merely some association between the use or feature of the Dyson products and the ad claim would violate the Settlement Agreement, while another reasonable interpretation would require a causal sequence between the 'use or feature' of the Dyson product and the ad claim."  (*Id.*)

Oreck incorrectly relies on the definition of "connection" alone, when the phrase "in connection with" is itself defined. The phrase "in connection with," as a whole, is defined as "together with; in conjunction with."  *Webster's New World College Dictionary* 309 (4th Ed. 1999).  This definition resolves Oreck's proposed ambiguity.  Neither "together with" or "in conjunction with" supports the "casual sequence" interpretation advanced by Oreck.  Indeed, Oreck makes no effort to explain how a claim that a Dyson is "unsanitary, dirty, unhealthy, or like"

can have a causal connection to the product's use or feature.[1]
By contrast, substituting the word "association" for "connection"
is consistent with how the phrase "in connection with," as a
whole, is defined, and preserves the sentence's plain meaning,
*i.e.,* that Oreck cannot refer to the Dyson as "unsanitary, dirty,
unhealthy, or like" when the ad uses or features the product.

The Court also does not find the phrase "or the like"
ambiguous here.  The Oxford English Dictionary defines the phrase
"or the like" as "a formula used to avoid further enumeration of
an indicated class."  Similarly, "the like" is defined as
"something or anything similar; the same kind of thing."  In the
settlement agreement, the phrase indicates that the terms
"unsanitary, dirty, unhealthy" are illustrative.  It shows that
the agreement prohibits the use of these terms and terms similar
in meaning to each of the listed adjectives.  Webster's New World
College Dictionary (4th Ed. 1999) defines unsanitary, unhealthy,
and dirty, respectively, as: "not sanitary; unhealthful or likely
to cause disease"; "harmful to health; unwholesome"; and "soiled
or soiling with dirt; unclean; causing one to be soiled in dirt;
lacking luster or brilliance; dull, grayish, etc."  In relation

---

[1] Oreck also selectively relies on half of its preferred
definition.  The definition Oreck relies on refers to a causal or
*logical* connection, and the Court does not see any difference
between an association and a logical connection in this context.

to these terms, "or the like" easily encompasses the adjectives and descriptive phases that Oreck argues do not implicate the settlement agreement, including that the Dyson "spreads" or "spews" dust, dirt, germs, *etc.;* is "messy," "not very clean or sanitary," and "disgusting."

The phrase does have its limits. The phase "unsanitary, unhealthy, dirty, or the like" cannot reasonably be stretched to reach the claim made in Oreck's newspaper ad inviting customers to "Come in and Compare . . . . [w]hich [vacuum] is more sanitary. . . . [a]nd which one has technology so advanced it helps inhibit bacteria in and on the vacuum." (Dyson's Ex. 17 at 06592.) The ad implies that the Oreck is the "more sanitary" of the two, but it does not follow that the Dyson is unsanitary. Rather, the ad simply touts a particular feature of the XL Ultra that Dysons lack. Oreck claims that this feature makes the XL Ultra "more sanitary" than the Dyson, but the ad does not claim that the Dyson is "unsanitary, unhealthy, dirty, or the like." The Court therefore dismisses Dyson's claim based on this particular ad at this time.

With these principles in mind, the Court will consider each advertisement at issue.

i. *XL 21 Commercials*

Both the short and long-form XL 21 commercials feature a

Dyson in connection with a claim that the vacuum is dirty.  In both commercials, a Dyson is pictured next to two other bagless vacuums while the announcer states that bagless vacuums "can spew dust and dirt into the air you breathe."  This statement is encompassed within the phrase "unsanitary, unhealthy, dirty, or the like."  Specifically, "dirty" is defined as "causing one to be soiled in dirt," which is the presumed consequence of "spewing" dirt into the air.

Oreck argues that these commercials do not "feature" the Dyson because the Dyson is depicted only briefly.  Oreck defines "feature" to mean "give special prominence," (Oreck's Mem. in Opp. at 7.), while Dyson apparently argues that any depiction of a Dyson vacuum in an ad counts as "featuring" the product.  The difference between these two definitions in the context of the settlement agreement is marginal.  The agreement forbids Oreck from "featur[ing] the [Dyson] in connection with any claim that [the Dyson] is unsanitary, dirty, unhealthy, or the like."  The inquiry, then, is whether the Dyson is "featured" in relation to a particular claim, not the advertisement as a whole.

Oreck argues that the long-form commercial does not feature the Dyson because it displays the Dyson for only 22 seconds of a 28 minute infomercial.  Likewise, Oreck states that the Dyson is present for only one-second of the 120-second short commercial.

The Dyson is, however, given prominence in connection with Oreck's claim that bagless vacuums spew dirt.  It is one of three bagless vacuums displayed while this claim is spoken, and the Court finds that this features the Dyson in connection with this claim.

Oreck makes an additional argument that is unique to the XL-21 commercials.  Oreck argues that both the long and short form XL-21 commercials are "grandfathered" under section 1(a) of the settlement agreement because they were created before the agreement's Effective Date.

Section 1 of the settlement agreement addresses "Future Advertising."  Subsection (a) of that provision states:

> The parties shall be free to use, at their election, the advertising claims that are being made by either party as of the Effective Date for the products existing in the United States marketplace as of the Effective Date, without incurring any further liability to each other.

(Dyson's Ex. 1.)  The key word in this clause is "claims."  The provision allows Oreck to continue making certain claims about Dyson's products that existed on the Effective Date, as long as Oreck used that claim before the Effective Date.  Oreck argues that the XL-21 commercials, which were produced and originally aired before the Effective Date, qualify.

Dyson disagrees because the XL 21 ads visually depict a Dyson. Dyson bases this argument on the language of section 1(b), which states:

> For a period of one year after the Effective Date, neither Dyson nor Oreck, in any visual element of its advertisements, shall use or feature the vacuums of the other in connection with any claim that either product is unsanitary, dirty, unhealthy, or the like.

(*Id.*) Dyson argues that section 1(b) is a one-year, flat ban on advertisements that use or feature a Dyson in a "visual element" in connection with "a claim that [the Dyson] is unsanitary, dirty, unhealthy, or the like," regardless of whether the commercial was created before the Effective Date.

Both sides have submitted evidence of the parties' intent in drafting these two clauses. When the words of a contract are clear and unambiguous and lead to no absurd consequences, the Court will discern the contract's meaning and the parties' intent within the four corners of the document. La. Civ. Code arts. 1848, 2046. *See also American Totalisator Co. v. Fair Grounds Corp.*, 3 F.3d 810, 813 (5th Cir.1993). Because the Court finds that the settlement agreement is clear, the Court declines to address this evidence.

Sections 1(a) and 1(b) "must be interpreted in light of

[each] other," La. Civ. Code. Art. 2050, and the Court must give each clause "a meaning that renders it effective." *Id.* at art. 2049.  Section 1(a) permits Dyson to make certain advertising "claims" about some Dyson products, while section 1(b) prohibits the use or feature of the product in a a "visual element" in connection with a "claim."  Read together, the term "claim" in these two provisions refers to a given statement, such as "bagless vacuums are dirty."  Visual elements are identified and treated separately.  Section 1(a) allows claims but does not address visual representations.  Similarly, 1(b) prohibits visual representations used or featured in connection with certain claims but does not make the claims alone actionable.  The settlement agreement allows Oreck to make the claim that certain Dyson products are dirty, assuming Oreck also made this claim before the Effective Date.  The agreement does not permit Oreck to use or feature a Dyson in a "visual element" in connection with the claim.  The XL 21 commercials fall into the latter category and are not subject to section 1(a)'s "grandfather" provision.

 ii.  *"Dare to Compare" Infomercial*

 The "Dare to Compare" infomercial contains several unambiguous breaches of the settlement agreement.  About five minutes into the commercial, the host empties the Dyson's dustbin

17

into the trash and exclaims "I'm dirty . . . the floor I just vacuumed is dirty again . . . . I don't think this is sanitary at all."  This statement implicates the definition of dirty as "causing one to be soiled in dirt" and also calls the vacuum unsanitary.  The parties dispute whether the host "uses" the Dyson in this segment.

Dyson argues that "use" means to depict or display the vacuum, while Oreck contends that the settlement agreement is only violated when the vacuum is being operated.  Merriam Webster's definition supports both usages.  Merriam Webster's defines "use" as "to put into action; avail oneself of: Employ."[2] In an advertisement, Oreck avails itself of the Dyson vacuum by displaying the product and contrasting it with their own or making disparaging comments about the product.  Oreck's definition – that use requires that the machine be put into action – is equally plausible.  The Court rejects, however, Oreck's argument that the host does not use the Dyson unless she actually vacuums with it.  (*See* Dyson's Mem in Opp. at 7)("the conduct that Dyson complains of does not involve *any* vacuuming

---

[2] "Use" is also defined as "to consume or take (as liquor or drugs) regularly; to expend or consume by putting to use; to behave toward: act with regard to: treat; to carry out a purpose or action by means of: utilize or stand."  The Court does not find these definitions applicable, however, and Dyson does not argue that they are.

with a Dyson unit."). The ad shows the host emptying the Dyson's dust bin, which involves "put[ting] into action" or "availing oneself of" the Dyson as much as vacuuming does. The Court therefore finds that the segment described violates the agreement even under Oreck's narrower definition.

The infomercial contains several other clear breaches. Roughly ten-minutes later, the commercial's host states "I can really see how a bagless vacuum cleaner will spread dirt and dust all over my house and me . . . . you can also get that mess all over you." Both statements describe the Dyson as "causing one to be soiled in dirt." The host then states that the Dyson is unsanitary and dirty – as in "unclean" – when she says "not very clean or sanitary." The host features the Dyson during these statements by holding the Dyson's dustbin.

The commercial also features several testimonials in which either David Oreck or a customer empties (uses) the Dyson as customers exclaim "thats gross" and "what a mess." Both of these statements imply that the Dyson is "unclean" and "caus[es] one to be soiled in dirt."

*iii. In-store Materials*

Dyson also argues that the in-store materials Oreck provided to its franchisees violate the settlement agreement. It is unclear from Dyson's briefs under what circumstances the in-store

19

materials violate the settlement agreement.  At oral argument,

Dyson articulated two theories.  Dyson's more straightforward

argument claims that Oreck violates the settlement agreement when

a franchisee, as Oreck's agent, displays the training materials

or puts them to use by conducting an in-store demonstration.

Dyson also argues that Oreck violates the settlement agreement

when it gives its franchisees the materials and instructs them

that they can advertise using those materials only.

The Court finds Dyson's first argument persuasive.  "An

agent is one who acts for or in place of another by authority

from the latter." *Cross v. Cutter Biological Div. of Miles Inc.*,

676 So. 2d 131, 147 (La. Ct. App. 1996).  An agency relationship

can be created expressly or can be implied by apparent authority.

*Id.*  The test for implied agency is "whether the principal has

the right to control the conduct of the agent and whether the

agent has the right and authority to represent or bind the

principal."  *Id.*  Courts examine "the words and conduct of the

parties and the circumstances of the case" to determine whether

an agency relationship exists.  *Id.*

Here, Oreck's franchisees act as Oreck's agents when they

run advertisements.  The franchisees have no input or discretion

with respect to advertising content.  A November 2007 memo to

franchisees states "ONLY marketing materials that were created

and approved by Oreck Home Office marketing can be used for any aspect of the Come in and Compare campaign . . . . No one is permitted to use any 'home grown' creative or change any aspect of centrally created materials for this campaign." (Dyson's Ex. 23 at ORECK05369.) One Oreck franchisee confirmed this arrangement, testifying in her deposition that franchisees can "only use the ads that [Oreck] provide[s] or get approval for something other than what they provide." (Dyson's Ex. 22 at 32:22-23.) Although franchisees retain discretion whether to run a particular ad campaign, they are limited to advertisements provided by Oreck if they advertise at all. (Oreck's Ex. C at 104:23-105:13)("So materials that are made available to us and things that [Oreck] tells us, you know, possible scenarios or training or so on and so forth are still the option of the independent owner whether they implement them or not."). The Court therefore finds that ads run by franchisees in compliance with Oreck's advertising instructions can be attributed to Oreck for purposes of the settlement agreement.

Dyson has demonstrated only one violation under this theory, however. Lori Miller, a California franchisee, stated in her deposition that "for the purpose of [Dare to Compare], if we talked to customers when they saw the Dyson vacuum and if we were talking about bag disposal or dirt disposal, then, yes, it would

be, you know, 'yeah, this is probably dirtier than having a bag."
(Dyson's Ex. 22 at 112:1-5.) Oreck directs franchisees to
conduct similar demonstration in its eight-point script and other
training materials. (*See* Dyson Ex. 18.) The comparative
adjective "dirtier" is a straight-forward violation of the
agreement's terms. Moreover, Miller's statements indicate that
she featured the Dyson in connection with this claim when she
says "this [*i.e.* the Dyson] is probably dirtier than having a
bag." (Dyson's Ex. 22 at 112:1-5.) Since the presence of an
actual Dyson vacuum satisfies the "visual element" requirement of
the agreement, the Court holds that Miller's statements describe
an advertisement violating the settlement agreement.

Dyson also argues that a franchisee displayed an information
sheet comparing an Oreck and Dyson in violation of the settlement
agreement, but Dyson has not proved that the franchisee's actions
violated the agreement. Dyson produced a letter from its counsel
to Oreck's stating "Oreck is apparently using display advertising
in its retail stores that purports to compare the Dyson DC14
model vacuum cleaner to a new Oreck XL Ultra model." (Dyson's
Ex. 22.) Attached to the letter is a chart that depicts a Dyson
with the caption "dirty." (*Id.*) Oreck's "Dare to Compare"
training materials suggest that franchisees frame the sheet with
plexi glass and display it in the store's demonstration area,(*id.*

22

at 08761), but no evidence demonstrates that this instruction was followed here. Oreck argues that the chart is for training purposes only, and the Court is not prepared to hold that any display of the chart in an Oreck franchise store, regardless of location, is an advertisement that violates the settlement agreement. Since there is an issue of fact as to how and where the chart was displayed, the Court cannot find a breach based on the evidence provided.

The Court next rejects Dyson's argument that Oreck violates the settlement agreement when it gives its franchisees the materials and instructs them that they can advertise using those materials alone. Dyson faces only a potential injury when Oreck provides its franchisees with these materials. The evidence indicates that franchisees are not required to run a certain ad campaign or a particular aspect of that campaign. (Oreck's Ex. C at 104:23-105:13)("So materials that are made available to us and things that [Oreck] tells us, you know, possible scenarios or training or so on and so forth are still the option of the independent owner whether they implement them or not."). If a given franchisee chooses to opt out, Dyson is not harmed. As there is no guarantee that the materials Oreck sends to a franchisee will be used in a manner prohibited by the agreement, the Court cannot accept Dyson's argument that just providing

materials to franchisees is a violation. Dyson must point to actual conduct by the franchisees to demonstrate a breach of the parties' agreement and Dyson has shown only one such violation in connection with its motion.

## IV. Conclusion

Dyson's Motion for Summary Judgment is GRANTED in part and DENIED in part for the reasons stated.


New Orleans, Louisiana, this 14th day of August, 2009.


_Sarah Vance_
_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE